## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

FOREST VIEW REHABILITATION AND
NURSING CENTER, LLC,

     Plaintiff,

     v.

THE UNITED STATES SMALL BUSINESS
ADMINISTRATION; ISABELLA CASILLAS
GUZMAN, in her official capacity as
Administrator of the Small Business
Administration; JANET YELLEN, in her
official capacity as the United States
Secretary of the Treasury; and THE
UNITED STATES OF AMERICA.

     Defendants.

Case No. 24 CV 1490

Hon. Georgia N. Alexakis

## MEMORANDUM OPINION AND ORDER

In March 2020, Congress passed the Coronavirus Aid, Relief, and Economic Security ("CARES") Act to provide economic relief to Americans and businesses during the COVID-19 pandemic. As part of the CARES Act, Congress authorized the Small Business Administration ("SBA") to grant potentially forgivable loans to eligible small businesses through the Paycheck Protection Program ("PPP"). A subsequent SBA regulation called the "Corporate Group Rule" limited the amount a single "corporate group" could receive in aggregate PPP loans to $20 million.

Plaintiff Forest View Rehabilitation and Nursing Center, LLC ("Forest View") applied for and received a PPP loan but was ultimately denied forgiveness because it was deemed part of a "corporate group" that had already surpassed the $20-million

limit. After an unsuccessful administrative appeal, Forest View filed this suit against the SBA, its Administrator, the Secretary of the Treasury, and the United States of America. [1]. Specifically, Forest View challenges the SBA's statutory authority to implement the Corporate Group Rule under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(C), and the SBA's application of the rule to Forest View under 5 U.S.C. § 706(2)(A).

Before the Court are the parties' cross-motions for summary judgment, [28], [39], as well as Forest View's related motion for an order compelling reimbursement of funds [48]. For the reasons set forth below, defendants' motion for summary judgment is granted, and Forest View's motions for summary judgment and an order to compel reimbursement of funds are denied. The SBA's final decision denying Forest View forgiveness of its PPP loan is affirmed.[1]

---

[1] Two other members of the same "corporate group" as Forest View—Oak Lawn Respiratory and Rehabilitation Center, LLC, and Parkshore Estates Nursing and Rehabilitation Center, LLC—have filed similar suits against the same defendants. *See Oak Lawn Respiratory and Rehab. Ctr., LLC v. U.S. Small Bus. Admin., et al.*, No. 23 CV 4363 (N.D. Ill.) ("*Oak Lawn*"); *Parkshore Ests. Nursing and Rehab. Ctr., LLC v. U.S. Small Bus. Admin., et al.*, No. 23 CV 4367 (N.D. Ill.) ("*Parkshore*"). All three cases have been deemed related under NDIL Local Rule 40.4. *See Forest View Rehab. and Nursing Ctr., LLC v. U.S. Small Bus. Admin., et al.*, No. 24 CV 1490, [19] (N.D. Ill.); *Parkshore*, No. 23 CV 4367 at [19]; *Oak Lawn*, No. 23 CV 4363 at [53]. Contemporaneous with the issuance of this memorandum opinion and order, the Court enters a separate order in the *Parkshore* and *Oak Lawn* matters, denying plaintiffs' motions for summary judgment, granting defendants' motions for summary judgment, and affirming the SBA's final decisions.

BACKGROUND

## I. Factual Background

### A. The SBA

Congress established the SBA as part of the Small Business Act of 1953 ("the Act") with the goal to "aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns." Pub. L. 83-163, 67 Stat. 232 (1953), codified at 15 U.S.C. § 631(a); 15 U.S.C. § 633(a). The Act granted the new agency "extraordinarily broad powers" to advance the interests of small businesses, "including that of lending money to small businesses whenever they could not get necessary loans on reasonable terms from private lenders." *Small Bus. Admin. v. McClellan*, 364 U.S. 446, 447 (1960).

Congress granted the SBA authority to issue these loans in § 7(a) of the Act. Specifically, § 7(a) "empower[s]" the SBA "to make loans to any qualified small business concern … either directly or in cooperation with banks or other financial institutions." 15 U.S.C. § 636(a). In drafting § 7(a), Congress placed certain limitations on the loans the SBA can issue to small businesses. *See generally id.* For example, Congress provided that all loans "shall be of such sound value or so secured as reasonably to assure repayment." *Id.* § 636(a)(6). Section 7(a) also bars the SBA from issuing a loan "if the applicant can obtain credit elsewhere." *Id.* § 636(a)(1)(A)(i).

To determine loan eligibility, Congress authorized the SBA to "specify detailed definitions or standards by which a business concern may be determined to be a small business concern." *Id.* § 632(a)(2)(A). Acting on this authority, the SBA has issued

3

detailed regulations laying out the eligibility requirements for § 7(a) loans. For example, SBA regulations provide that eligible small businesses must be operating for profit, must be in the United States, and must fit certain size requirements determined based on the industry, number of employees, and annual receipts. 13 C.F.R. § 121.100(a)–(d); *id.* § 121.201. Regulations also provide that small businesses seeking loans must "[b]e able to demonstrate a need for the desired credit." *Id.* § 120.100(e).

**B. The CARES Act and the PPP**

Congress passed the CARES Act in March 2020 to address the COVID-19 pandemic's impact on the U.S. economy. *See* Pub L. No. 116-136, 134 Stat. 281 (2020). The CARES Act provided direct economic relief to American families, workers, and small businesses. *See id.* Relevant to this lawsuit, the CARES Act created the PPP, which provided forgivable loans to eligible small businesses so long as the funds were used for certain expenses, such as payroll and employee benefits. *See* 15 U.S.C. § 636(a)(36)(F).

When Congress created the PPP, it did not create a standalone program. Instead, it embedded the CARES Act provisions establishing the PPP within § 7(a)'s existing statutory framework for small business loans. The new CARES Act provisions provided that "the Administrator may guarantee covered loans under the same terms, conditions, and processes as a loan made under" § 7(a) "[e]xcept as otherwise provided" in 15 U.S.C. § 636(a)(36). *See id.* § 636(a)(36)(B).

In some ways, the CARES Act expanded the eligibility requirements for PPP loans compared to the usual requirements for small business loans under § 7(a). For example, in a subsection titled "Increased eligibility for certain small businesses and organizations," Congress provided that "in addition to small business concerns, any business concern … shall be eligible to receive a covered loan if the business concern … employs not more than the greater of … 500 employees; or … if applicable, the size standard in number of employees established by the [SBA] for the industry in which the business concern … operates." *Id.* § 636(a)(36)(D)(i)(I). The CARES Act also eliminated § 7(a)'s requirement that the applicant be unable to obtain credit elsewhere, *see id.* § 636(a)(36)(I), and made certain nonprofit organizations eligible, *see id.* § 636(a)(36)(D)(iii)(III)(aa). The CARES Act also altered § 7(a)'s previous $5-million maximum loan amount to be instead the lesser of (1) the borrower's average monthly payroll costs for the prior year multiplied by 2.5 plus the balance of the borrower's eligible SBA disaster loans; or (2) $10 million. *Id.* § 636(a)(36)(E).

### C. The Corporate Group Rule

Congress granted the SBA emergency authority to make rules implementing the CARES Act without following the APA's usual notice requirements. *See id.* § 9012 (directing the SBA's Administrator to "issue regulations to carry out this title and the amendments made by this title without regard to the notice requirements under [the APA]"). Pursuant to this authority, the SBA adopted a series of Interim Final Rules ("IFRs") implementing the PPP.

At the center of this dispute is a limitation the SBA created as part of the Sixth IFR called the "Corporate Group Rule." 85 Fed. Reg. 26,324 (May 4, 2020). That rule provided that "businesses that are part of a single corporate group shall in no event receive more than $20,000,000 of PPP loans in the aggregate." *Id.* at 26,325. In turn, the rule defined "corporate group" as businesses that are "majority owned, directly or indirectly, by a common parent." *Id.* SBA concluded that it had authority to issue an "aggregate limitation" on the amount of PPP loans issued to a single corporate group because the terms of the CARES Act "specify a 'maximum'—but not a minimum— loan amount" for each borrower that SBA "may" guarantee. *Id.* at n.1 (citing 15 U.S.C. § 636(a)(36)(B), (E)).

The limitation became "immediately effective with respect to any loan that" had "not yet been fully disbursed as of April 30, 2020." *Id.* The rule also required loan seekers to "notify the lender if [they had] applied for or received PPP loans in excess of" the $20 million limit and to "withdraw or request cancellation of any pending PPP loan application or approved PPP loan not in compliance with the limitation." *Id.*

### D. Forest View's PPP Loan Application

Forest View is a skilled rehabilitation and nursing center. [52] ¶ 1. Michael Blisko and Gubin Enterprises Limited Partnership ("Gubin Enterprises") each own a 50% share in Forest View. *Id.* On April 13, 2020, Forest View applied for a PPP loan with Fifth Third Bank. [52] ¶ 2. Fifth Third approved the application on May 1, 2020. *Id.* ¶ 5. Then, on May 18, 2020, Blisko executed a promissory note on Forest View's

behalf, and the same day Fifth Third disbursed a PPP loan to Forest View for $1,069,800. *Id.* ¶¶ 8–9.

The next year, in 2021, Forest View applied for full forgiveness of the loan. *Id.* ¶ 10. Initially, the SBA issued a final loan review decision granting partial forgiveness in the amount of $1,007,592, which was 2.5 times Forest View's average monthly payroll. *Id.* ¶ 12. But on June 3, 2023, the SBA changed course and issued another decision denying Forest View's loan-forgiveness application. *Id.* ¶ 23. The SBA provided the following basis for the denial:

> After a review of the documentation provided, the SBA concludes that the Borrower business which is part of a corporate group has received more than $20,000,000 of PPP loans in the aggregate.

> A thorough analysis of the supporting documentation confirms that the corporate group of Moishe Gubin and Michael Blisko exceeded the limitation for PPP loan funds to a single corporate group prior to April 30, 2020. Therefore, any entity associated with/listed under this corporate group was ineligible for additional PPP funding after April 30, 2020. This loan has been identified as one of the loans funded after the maximum allowable amount was exceeded.

[30] at USA_0001.

## II.  Procedural History

Forest View appealed the SBA's decision denying its loan application to the SBA's Office of Hearings and Appeals ("OHA") in July 2023. [52] ¶ 24. A few months later, OHA issued a decision affirming the denial of loan forgiveness. *Id.* ¶ 30; *see also* [30] at USA_2019–33. The OHA also denied as moot a motion Forest View filed seeking to compel the SBA to reimburse Forest View for funds that, Forest View

contended, the agency had improperly recouped on Forest View's PPP loan. [52] ¶¶ 31–32.

In February 2024, Forest View filed this suit against the SBA, Isabella Casillas Guzman (in her official capacity as SBA Administrator), Janet Yellen (in her official capacity as U.S. Secretary of the Treasury), and the United States, challenging defendants' actions under the APA, 5 U.S.C. § 706(2)(A), (C). The complaint seeks a permanent injunction barring the SBA from enforcing the Sixth IFR against Forest View and ordering that the SBA reimburse Forest View for the money it "improperly recouped" because of the denial. [1] at 21. Forest View also seeks attorneys' fees pursuant to 28 U.S.C. § 2412. *Id.* ¶¶ 128–30.

Forest View and defendants later filed cross-motions for summary judgment on all claims, *see* [28]; [39], and Forest View separately moved for an interlocutory order compelling the SBA to return funds that Forest View maintains were improperly recouped [48]. The Court addresses these motions next.

## LEGAL STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A fact is "material" if it affects the substantive outcome of the litigation, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and a dispute is "genuine" if there is enough evidence for a reasonable jury to return a verdict for the nonmoving party, *see Scott v. Harris*, 550 U.S. 372, 380 (2007). The nonmoving party can defeat summary judgment only by showing that a reasonable jury could render a

verdict in its favor. *See Anderson*, 477 U.S. at 248. At summary judgment, the Court views the record in the light most favorable to the nonmoving party and draws all reasonable inferences in that party's favor. *See id.* at 255.

## DISCUSSION

Forest View argues summary judgment is appropriate because (1) the SBA lacked statutory authority to enforce the Corporate Group Rule, (2) the rule was arbitrary and capricious, (3) the rule was inapplicable to Forest View, and (4) the SBA should be equitably estopped from undoing its initial decision to partially forgive Forest View's PPP loan. In addition, Forest View argues that defendants improperly collected on Forest View's PPP loan while it should have been in deferment.

In their cross-motion for summary judgment, defendants assert that (1) the SBA is immune from suits that bring claims seeking injunctive relief, (2) the SBA lawfully adopted the Corporate Group Rule, (3) the SBA properly applied the rule to Forest View, and (4) equitable estoppel does not warrant vacating the OHA's decision denying forgiveness. For these same reasons, defendants also assert that the SBA did not improperly collect on Forest View's PPP loan, so no funds need to be returned.

The Court considers each argument in turn.

## I. Sovereign Immunity and the Availability of Injunctive Relief

"It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." *United States v. Mitchell*, 463 U.S. 206, 212 (1983); *see also FDIC v. Meyer*, 510 U.S. 471, 475 (1994). A waiver of sovereign immunity "must be expressly and unequivocally stated in the text of the relevant statute." *Sossamon v. Texas*, 563 U.S. 277, 290 (2011).

9

As plaintiff, Forest View has the burden of showing the federal government has waived its sovereign immunity and consented to suit. *See Macklin v. United States*, 300 F.3d 814, 819 (7th Cir. 2002). Forest View attempts to meet this burden by pointing to SBA regulations anticipating judicial review of the agency's loan review decisions. Specifically, Forest View points to 13 C.F.R. § 134.1201(d), which provides that a borrower must appeal to OHA before seeking judicial review in federal court, and 13 C.F.R. § 134.1211(g), which says that "[f]inal decisions may be appealed to the appropriate Federal district court only." But "the power to waive the federal government's immunity is Congress's prerogative"—not that of a federal agency. *Dep't of Agric. Rural Dev. Rural Hous. Serv. v. Kirtz*, 601 U.S. 42, 48 (2024).

For their part, defendants point to 15 U.S.C. § 634(b)(1) as proof of their immunity from this matter. That provision states that "the Administrator may … sue and be sued in any court of record of a State having general jurisdiction, or in any United States district court, and jurisdiction is conferred upon such district court to determine such controversies without regard to the amount in controversy." But it also contains the following caveat: "[N]o attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Administrator or his property." 15 U.S.C. § 634(b)(1). Defendants argue that this exception to the rule unambiguously shields them from suits seeking injunctive relief, like this one.

On its face, § 634(b)(1)'s plain text appears to do exactly that. Although the Administrator may "sue and be sued," § 634(b)(1) also states that "no … injunction … shall be issued against the Administrator or his property." *Id.* Some courts—such as

10

the Fourth, Fifth, and Tenth Circuits—have relied on this language to bar plaintiffs from seeking any and all injunctive relief against the SBA. *See, e.g., Mar v. Kleppe*, 520 F.2d 867, 869 (10th Cir. 1975); *Valley Const. Co. v. Marsh*, 714 F.2d 26, 29 (5th Cir. 1983); *J.C. Driskill, Inc. v. Abdnor*, 901 F.2d 383, 386 (4th Cir. 1990); *In re Hidalgo Cty. Emergency Serv. Found.*, 962 F.3d 838, 840 (5th Cir. 2020). These courts credit the "fundamental canon of statutory construction that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (cleaned up).

Meanwhile, other courts, including the First Circuit, have found that § 634(b)(1) only bars requests for certain forms of injunctive relief. *See, e.g., Ulstein Mar., Ltd. v. United States*, 833 F.2d 1052, 1056–57 (1st Cir. 1987); *Camelot Banquet Rooms, Inc. v. U.S. Small Bus. Admin.*, 458 F. Supp. 3d 1044, 1052 (E.D. Wis. 2020); *Defy Ventures, Inc. v. U.S. Small Bus. Admin.*, 469 F. Supp. 3d 459, 471 (D. Md. 2020); *Alaska Urological Inst., P.C. v. U.S. Small Bus. Admin.*, 619 B.R. 689, 698–701 (D. Alaska 2020). Although the First Circuit relied heavily on legislative history to reach this conclusion, *see Ulstein*, 833 F.2d at 1056–57, other courts in this camp have relied on canons of statutory construction, reasoning that the meaning of "injunction" should be narrowed based on the more specific words surrounding it: "attachment," "garnishment," and "other similar process," *see Tradeways, Ltd. v. U.S. Dep't of the Treasury*, No. CV ELH-20-1324, 2020 WL 3447767, at *11 (D. Md. June 24, 2020); *In re Vestavia Hills, Ltd*, 630 B.R. 816, 834 (S.D. Cal. 2021). As a result, these courts have suggested that any assertion of sovereign immunity in § 634(b)(1) may only

apply to injunctions that "interfer[e] with the SBA's commercial operations or property," but not to injunctions where the SBA exceeded its statutory authority. *Tradeways*, 2020 WL 3447767, at *11.

For reasons similar to those articulated in cases such as *Tradeways*, the Court has its doubts that Congress intended § 634(b)(1) to wholly immunize the SBA from judicial review in any matter involving injunctive relief. But because the Court ultimately enters summary judgment on defendants' behalf on the merits, it need not resolve the question of the agency's sovereign immunity. *See In re Vestavia Hills*, 630 B.R. at 835 (recognizing the sovereign immunity question, but resolving the question on the merits instead); *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1255 n.7 (11th Cir. 2020) (same); *Tradeways*, 2020 WL 3447767, at *11 (same).

## II. APA Claims

### A. Whether the SBA Exceeded Its Statutory Authority

Forest View next argues that the SBA exceeded its statutory authority when it enacted the Corporate Group Rule. The APA requires courts to "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). Following the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2273 (2024), "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." In other words, "courts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." *Id.* However, "[w]hen the best reading of a statute is that it delegates discretionary

authority to an agency, the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits." *Id.* at 2263. "The court fulfills that role by recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in reasoned decisionmaking within those boundaries." *Id.* (cleaned up).

As already discussed, Congress granted the SBA "extraordinarily broad powers" to carry out § 7(a)'s loan program for small businesses. *McClellan*, 364 U.S. at 447. This breadth is readily apparent in the plain language of § 634(b)(6) and (7). In § 634(b)(6), Congress granted the SBA expansive authority to "make such rules and regulations as [it] deems necessary to carry out the authority vested in" it. 15 U.S.C. § 634(b)(6). And in § 634(b)(7), it gave the Administrator power to "take any and all actions … when [it] determines such actions are necessary or desirable in making … or otherwise dealing with or realizing on loans." *Id.* § 634(b)(7). Because Congress placed the PPP within the existing framework for SBA loans, it is safe to presume, absent contrary evidence in the text of the CARES Act, that the broad authority Congress granted the SBA in § 634(b)(6) and (7) extends to the SBA's ability to implement the PPP. *See Pharaohs GC, Inc. v. U.S. Small Bus. Admin.*, 990 F.3d 217, 227 (2d Cir. 2021) ("We presume that Congress legislates against the backdrop of existing law.") (citing *Garcia v. Teitler*, 443 F.3d 202, 207 (2d Cir. 2006)); *Nat'l Archives & Recs. Admin. v. Favish*, 541 U.S. 157, 169 (2004) ("We can assume Congress legislated against this background of law, scholarship, and history when it

enacted FOIA and when it amended Exemption 7(C) to extend its terms."); *United States v. Howell*, 24 F.4th 1138, 1145 (7th Cir. 2022) (analyzing a different CARES Act provision and writing that courts "presume that 'Congress is aware of existing law when it passes legislation'").

Forest View does not dispute that the SBA enjoys broad authority to set the details of the loan programs Congress established in § 634(b). Forest View asserts, however, that Congress expressly barred the SBA from imposing additional PPP eligibility requirements via § 636(a)(36)(D)(i). That provision provides:

> During the covered period, in addition to small business concerns, *any business concern*, nonprofit organization, housing cooperative, veterans organization, or Tribal business concern described in section 657a(b)(2)(C) of this title *shall be eligible to receive a covered loan* if the business concern, nonprofit organization, housing cooperative, veterans organization, or Tribal business concern employs not more than the greater of--
>
> (I)    500 employees; or
>
> (II)   if applicable, the size standard in number of employees established by the Administration for the industry in which the business concern, nonprofit organization, housing cooperative, veterans organization, or Tribal business concern operates.

*Id.* § 636(a)(36)(D)(i) (emphases added). Forest View argues that "any business concern … shall be eligible" means that *every* business concern meeting the CARES Act's other threshold requirements was eligible for PPP loans. Because the Corporate Group Rule imposed an additional eligibility requirement that was not in the CARES Act, but was instead imposed via agency regulation, Forest View maintains that the SBA exceeded its statutory authority.

This textual argument is appealing at first glance, particularly where "the term 'any' ordinarily carries an expansive meaning," *see Home Depot U. S. A., Inc. v. Jackson*, 587 U.S. 435, 445 (2019), and the word "shall" creates an obligation, *see Smart Oil, LLC v. DW Mazel, LLC*, 970 F.3d 856, 865 (7th Cir. 2020). Read in a vacuum, therefore, Congress' instruction that "any business concern … shall be eligible" could suggest that the SBA lacked authority to implement other eligibility limitations on top of those already in the CARES Act. But a court's duty is "to construe statutes, not isolated provisions." *King v. Burwell*, 576 U.S. 473, 486 (2015) (quoting *Graham Cnty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280, 290 (2010)). Indeed, "[i]t is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Home Depot U. S. A., Inc.*, 587 U.S. at 441 (quoting *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989)); *see also River Rd. Hotel Partners, LLC v. Amalgamated Bank*, 651 F.3d 642, 651 (7th Cir. 2011) ("When deciding between competing understandings of a statute, courts often consider the objectives of the larger statutory scheme and select the meaning that produces a substantive effect that is compatible with the rest of the law.") (cleaned up).

The unsatisfying nature of Forest View's textual argument becomes apparent when the Court considers the greater statutory scheme. In addition to the expanded size allowances in § 636(a)(36)(D)(i), the CARES Act expanded eligibility rules for PPP loans in several ways. For example, § 636(a)(36)(I) waived § 7(a)'s usual requirement that a borrower must demonstrate that it cannot obtain credit elsewhere

15

to be eligible for an SBA loan. *See* 15 U.S.C. § 636(a)(36)(I). It also waived certain affiliation rules set in previous SBA regulations, *see id.* § 636(a)(36)(D)(iv), as well as the requirement that borrowers provide collateral and a personal guarantee, *see id.* § 636(a)(36)(J). If, as Forest View suggests, Congress meant for PPP loans to be available to *any* business concern without limitations (save for the size cap), Congress would not have needed to specify that it was expanding eligibility in these additional ways relative to the usual rules for SBA loans. Forest View's interpretation is therefore "at odds with one of the most basic interpretive canons": "that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." *Corley v. United States*, 556 U.S. 303, 314 (2009); *see also Pharaohs GC, Inc.*, 990 F.3d at 227 (same interpretation "would render several provisions of the CARES Act superfluous"); *In re Gateway*, 983 F.3d at 1259 (same); *Tradeways*, 2020 WL 3447767, at *13 (same).

Section 636(a)(36)(B) also casts serious doubt on Forest View's reading. That provision provides that, "[e]xcept as otherwise provided in this paragraph, the Administrator may guarantee covered loans under the same terms, conditions, and processes as a loan made under" § 7(a). 15 U.S.C. § 636(a)(36)(B). If the SBA lacked authority to implement other eligibility rules, that prohibition would be directly at odds with § 636(a)(36)(B)'s instruction that the agency could continue to guarantee loans under the same terms, conditions, and processes as other SBA loans. *See Pharaohs GC*, 990 F.3d at 228. Combined with the above provisions waiving preexisting eligibility requirements, § 636(a)(36)(B) makes it even clearer that

16

Congress understood it was legislating against the existing—and broad—backdrop of §7(a) when it added the CARES Act provisions establishing the PPP to that statutory framework.

Moreover, because it was well aware of the existing scheme under § 7(a), it is unlikely that Congress would have stripped the SBA's authority to implement other eligibility requirements without explicitly saying so. Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions— it does not, one might say, hide elephants in mouseholes." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001); *Tradeways*, 2020 WL 3447767, at *13; *cf. King*, 576 U.S. at 486 ("[H]ad Congress wished to assign a [a major] question to an agency, it surely would have done so expressly."). Congress' failure to clearly state that it was stripping the SBA of its rulemaking authority "militates against reading § 636(a)(36)(D)(i) to abrogate, rather than preserve," the SBA's existing authority under § 7(a). *Tradeways*, 2020 WL 3447767, at *13.

In addition to the text of § 636(a)(36)(D)(i), Forest View points to the provision in § 636(a)(36)(E) relating to the maximum loan amount. That provision of the CARES Act provides that, "with respect to a covered loan, the maximum loan amount shall be the lesser of" (1) the borrower's average monthly payroll costs for the prior year multiplied by 2.5 plus the borrower's eligible SBA disaster loans (the "payroll-based amount"), and (2) $10 million. 15 U.S.C. § 636(a)(36)(E). Forest View reads this language literally and expansively: to mean that "Congress intended for borrowers' PPP loan amounts to be either the payroll-based amount or $10,000,000, whichever

was smaller" in all cases, regardless of "a borrower's relationship with another business." [28-2] at 9–10.

But this argument, much like Forest View's interpretation of the "any business concern" eligibility language in § 636(a)(36)(D)(i), asks the Court to interpret statutory provisions in a vacuum. The Court returns to § 636(a)(36)(B), which provides that the SBA "*may* guarantee [PPP] loans under the same terms [and] conditions" as other § 7(a) loans, "[e]xcept as otherwise provided" in the other subparagraphs of § 636(a)(36). *See* 15 U.S.C. § 636(a)(36)(B) (emphasis added). The term "may" is permissive, not mandatory. *See Biden v. Texas*, 597 U.S. 785, 802 (2022) ("[T]he word 'may' *clearly* connotes discretion."). Then, the plain language of § 636(a)(36)(E) makes clear that this statutory provision sets a ceiling, but no floor, on the loan amount a business concern can receive through the PPP. *See* 15 U.S.C. § 636(a)(36)(E) (setting forth a "maximum" amount but specifying no minimum). Forest View's reading of § 636(a)(36)(E) mistakenly conflates a maximum with an entitlement, *see* [40] at 9, and that error is underscored by the permissive, rather than obligatory, nature of § 636(a)(36)(B). Moreover, read together, §§ 636(a)(36)(B) and 636(a)(36)(E) underscore the overall degree of discretion Congress granted the SBA to implement the PPP. They thus reinforce the conclusion that the SBA acted within its statutory authority in adopting the Corporate Group Rule as a mechanism by which to allocate the PPP's limited funds.

Forest View cites two decisions that have adopted its interpretation of § 636(a)(36)(D)(i), although neither decision specifically involved the Corporate

Group Rule. First, in *DV Diamond Club of Flint, LLC v. Small Business Administration*, 960 F.3d 743 (6th Cir. 2020), the Sixth Circuit held that "the Act's specification that 'any business concern' is eligible, so long as it meets the size criteria, is a reasonable interpretation." *Id.* at 746. In doing so, the Sixth Circuit emphasized that "'any' carries an expansive meaning" and concluded that its "broad interpretation also comports with Congress's intent to provide support to as many displaced American workers as possible." *Id.* at 646–47. A Michigan district court followed suit in *National Association of Home Builders v. United States Small Business Administration*, No. 20-11780, 2021 WL 4458660, at *11 (E.D. Mich. Sept. 28, 2021), echoing the Sixth Circuit's instruction that "'any' means any, and 'shall' means shall." *Id.* at *9.

The Court is not persuaded by these decisions for at least two reasons. First, although the Sixth Circuit in *DV Diamond Club* addressed the same textual argument presented by Forest View here, the court was responding (on an abbreviated timeframe) to the SBA's motion to stay a district court's grant of a motion for a preliminary injunction. *See DV Diamond Club*, 960 F.3d at 745–747. As a result, the Sixth Circuit's decision was not a final decision on the merits; it only determined, on an initial basis, that the merits arguments were likely to succeed. *Id.* Second, neither *DV Diamond Club* nor *National Association of Home Builders* addressed how their interpretations of the pertinent PPP provisions made sense in the overall statutory scheme. Unlike those two decisions, but like several others, this Court finds significant that the PPP "was added into the existing § 7(a) program" and thus its

provisions should be interpreted in light of Congress' broad grant of authority to the SBA reflected in the existing statutory scheme. *In re Gateway*, 983 F.3d at 1256.

The Court sides with the weight of authority rejecting Forest View's interpretation of § 636(a)(36)(D)(i). *See id* at 1256–57; *see also Pharaohs GC*, 990 F.3d at 226–28; *Tradeways*, 2020 WL 3447767, at *13–15; *Defy Ventures*, 469 F. Supp. 3d at 472–73.[2] It therefore concludes that the SBA acted within its statutory authority when enacting the Corporate Group Rule. *See* 5 U.S.C. § 706(2)(C).

**B. Whether the Corporate Group Rule Was Arbitrary and Capricious**

Forest View also asserts that the Corporate Group Rule was arbitrary and capricious and must be set aside pursuant to 5 U.S.C. § 706(2)(A). The Court disagrees.

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained …. A court simply ensures that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Fed. Commc'ns Comm'n v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). "Normally, an agency rule

---

[2] Defendants argue that Congress' failure to limit the SBA's rulemaking power when, in December 2020, it reauthorized the PPP in the Economic Aid Act ("EAA") signals its intent to ratify the SBA's authority to impose a corporate group limit. *See* [40] at 12–13. Although Congress' intent can sometimes be gleaned by its failure to make changes in subsequent statutes, *see, e.g.*, *Lorillard v. Pons*, 434 U.S. 575, 580 (1978), the congressional ratification doctrine only applies where "the supposed judicial consensus [was] so broad and unquestioned that we must presume Congress knew of and endorsed it," *see Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 349 (2005). In this instance, there is no "unquestioned" judicial consensus given the Sixth Circuit's decision agreeing with Forest View's interpretation in *DV Diamond Club*, 960 F.3d at 746–47, which preceded the PPP's reauthorization by several months.

would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "To meet the APA's arbitrary-and-capricious standard, 'the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *Gripum, LLC v. U.S. Food & Drug Admin.*, 47 F.4th 553, 558 (7th Cir. 2022) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

Forest View's argument under § 706(2)(A) closely resembles its text-based argument that the SBA lacked statutory authority to implement the Corporate Group Rule. Specifically, it maintains that the SBA "relied on factors which Congress has not intended it to consider" because Congress was clear that "*any* business concern" shall be eligible for PPP loans. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43. For the reasons already stated, the Court disagrees with Forest View's interpretation of the statute and therefore rejects its argument that the SBA relied on factors Congress did not intend it to consider.

Forest View separately argues that the Administrator has offered "little to no explanation" for the Corporate Group Rule "beyond merely stating platitudes." [51] at 11. The Court disagrees. The regulation itself offered a perfectly reasonable explanation for an aggregate limit on corporation groups: the rule would "preserve

the limited resources available to the PPP program" and "promote the availability of PPP loans to the largest possible number of borrowers, consistent with the CARES Act." 85 Fed. Reg. 26,325 (May 4, 2020). Moreover, the regulation provided that "a limitation of $20,000,000 strikes an appropriate balance between broad availability of PPP loans and program resource constraints." *Id.*

This explanation is especially reasonable considering the high demand for loan dollars at the start of the COVID-19 pandemic. When the SBA first launched the PPP on April 3, 2020, the entire $349 billion Congress had authorized was exhausted by April 16—even though the program was not set to terminate until June 30, 2020.[3] Therefore, when the SBA implemented the Corporate Group Rule on May 4, 2020, it explained that it was limiting loans to corporate groups "in light of the previous lapse of PPP appropriations and the high demand for PPP loans." 85 Fed. Reg. 26,325. Given the finite amount of loan dollars the SBA was authorized to distribute, this account more than suffices to establish a "rational connection between the facts found and the choice made.'" *Gripum*, 47 F.4th at 558 (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43).

Finally, Forest View argues that the Corporate Group Rule was arbitrary and capricious because it was enacted outside the limits set forth in 15 U.S.C. § 9012. In that provision, Congress granted the Administrator emergency rulemaking authority

---

[3] *See* Thomas Franck and Kate Rogers, *Small Business Rescue Loan Program Hits $349 Billion Limit and Is Now Out of Money*, CNBC (Apr. 16, 2020), https://www.cnbc.com/2020/04/16/small-business-rescue-loan-program-hits-349-billion-limit-and-is-now-out-of-money.html (last visited Dec. 30, 2024); *see also* CARES Act, Pub. L. No. 116-136, § 1102(b)(1), 134 Stat. 281, 293 (2020).

to issue regulations carrying out the CARES Act without the traditional notice and comment process "[n]ot later than 15 days after March 27, 2020." 15 U.S.C. § 9012. Forest View argues that because the SBA issued the Corporate Group Rule on May 4, 2020—38 days after Congress enacted the CARES Act—the SBA exceeded its statutory authority to implement the rule.

To begin, Forest View raises this argument for the first time in its reply brief—it did not raise the issue in its opening brief to this Court or to the OHA during the administrative review process. *See* [28]; [30] at USA_0090–0106. Per SBA regulations, "an appeal to OHA is an administrative remedy that must be exhausted before judicial review of a final SBA loan review decision may be sought in a Federal district court." 13 C.F.R. § 134.1201(d). SBA regulations also require that an appealing party provide a "full and specific statement as to why the final SBA loan review decision is alleged to be erroneous, together with *all … legal arguments* supporting the allegations." *Id.* § 134.1204(a)(2) (emphasis added). Given Forest View's failure to raise the issue until this point, the Court is inclined to consider the argument forfeited, if not waived altogether. *See Sims v. Apfel*, 530 U.S. 103, 108 (2000) (when agency regulations require issue exhaustion, "courts reviewing agency action regularly ensure against the bypassing of that requirement by refusing to consider unexhausted issues").

But even if Forest View had exhausted the issue, the Court would not vacate the Corporate Group Rule based on the SBA's failure to issue the regulation within § 9012's 15-day window. The Supreme Court has "expressed reluctance 'to conclude

23

that every failure of an agency to observe a procedural requirement voids subsequent agency action, especially when important public rights are at stake.'" *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 158 (2003) (quoting *Brock v. Pierce County*, 476 U.S. 253, 260 (1986)). Accordingly, "the federal courts will not in the ordinary course impose their own coercive sanction" unless Congress "specif[ies] a consequence for noncompliance with statutory timing provision." *Id.* at 159 (quoting *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 63 (1993)). In this case, Congress has not specified any consequence for an agency's failure to issue regulations within the 15-day time limit. The Court therefore reads § 9012's time window as "meant to spur the [Administrator] to action, not to limit the scope of [her] authority." *Id.* at 158 (quoting *Brock*, 476 U.S. at 265).

In sum, the Court concludes that the SBA's promulgation of the Corporate Group Rule was not arbitrary and capricious.

### C. Application of Corporate Group Rule to Forest View

Forest View argues, in the alternative, that the SBA misapplied the Corporate Group Rule in this instance. Specifically, it argues that (1) the SBA erred by applying the rule to Forest View retroactively, and (2) the SBA erred in finding that Forest View was subject to the rule at all.

#### 1. Retroactivity

Before reaching the substance of Forest View's retroactivity requirement, the Court begins by laying out the relevant sequence of events. Forest View submitted its application for a PPP loan to Fifth Third Bank on April 13, 2020, and Fifth Third

Bank approved the application on May 1, 2020. [52] ¶¶ 2, 5. Then, on May 4—after the bank had initially approved Forest View's loan but before the loan disbursement process had been completed—the SBA promulgated the Corporate Group Rule. *See* 85 Fed. Reg. 26,324. On May 18, one of Forest View's owners, Blisko, executed a promissory note on behalf of Forest View. [52] ¶ 8. That same day, Fifth Third disbursed a PPP loan to Forest View in the amount of $1,069,800. *Id.* ¶ 9.

Because it applied for a PPP loan before the SBA promulgated the Corporate Group Rule, Forest View maintains that the SBA impermissibly applied the rule retroactively. But when drafting the rule, the SBA did not base eligibility on the borrower's date of application. To the contrary, the rule applied to "any loan that ha[d] not yet been *fully disburse*d as of April 30, 2020." 85 Fed. Reg. 26,324 (emphasis added). Because Fifth Third Bank did not *disburse* Forest View's loan until two weeks after the rule was promulgated, the SBA did not retroactively apply to Corporate Group Rule to Forest View.

Forest View's timing argument is perhaps better framed as an assertion that Forest View had a vested right in receiving a PPP loan based on the regulations in place at the time of its application to Fifth Third Bank. But even then, the "mere filing of an application" is not "the kind of completed transaction in which a party could fairly expect stability of the relevant laws as of the transaction date." *Pine Tree Med. Assocs. v. Sec'y of Health & Human Servs.*, 127 F.3d 118, 121 (1st Cir. 1997); *see also Chadmoore Commc'ns, Inc. v. FCC*, 113 F.3d 235, 241 (D.C. Cir. 1997); *Labojewski v. Gonzales*, 407 F.3d 814, 822 (7th Cir. 2005); *BellSouth Telecomms., Inc.*

25

*v. Se. Tel., Inc.*, 462 F.3d 650, 660–61 (6th Cir. 2006). Instead, the filing of the initial application was "simply a preliminary step" for receiving a PPP loan, "not a final determination or event." *Durable Mfg. Co. v. U.S. Dep't of Lab.*, 578 F.3d 497, 503 (7th Cir. 2009) (labor certification application did not give plaintiff vested right to be exempt from subsequent Department of Labor regulation).

In sum, the agency did not err in finding that the Corporate Group Rule could be applied to Forest View even though Forest View applied for a loan before the rule went into effect.

### 2. Whether Forest View Was Part of a Corporate Group

Forest View further argues that the OHA erred in finding it is majority owned by a "corporate group." To start, neither party discusses in any detail the proper standard of review to apply to the OHA's decision. Forest View, for its part, does not mention a standard of review at all. Meanwhile, defendants say the OHA's application was not arbitrary and capricious and was supported by substantial evidence. In their response brief, they also contend that if there were any ambiguity in the SBA's own regulations, the agency should be entitled to deference under *Auer v. Robbins*, 519 U.S. 452 (1997). [57] at 12. The Court need not definitively resolve the proper standard of review because, as explained next, the OHA's determination passes muster even when granted no deference.

The Corporate Group Rule defines a "corporate group" as including businesses that "are majority owned, directly or indirectly, by a common parent." 85 Fed. Reg. 26,325. Here, the OHA determined that Forest View was part of a corporate group

because it was majority owned by a "common parent"—in particular, a partnership between Blisko and Gubin Enterprises. In other words, even though Blisko and Gubin Enterprises each only owned 50% of Forest View, the entity was nonetheless "majority owned" by the partnership because Blisko and Gubin Enterprises combined to own 100%.

Under Illinois' Uniform Partnership Act ("UPA"), a partnership is "the association of 2 or more persons to carry on as co-owners of a business for profit." *nClosures Inc. v. Block & Co.*, 770 F.3d 598, 603 (7th Cir. 2014) (quoting 805 ILCS 206/202(a)). The UPA defines "person" to mean "an individual" as well as a "corporation, limited liability company, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision, agency, or instrumentality, or any other legal or commercial entity." 805 ILCS 206/101(j). Forming a partnership does not require a written partnership agreement; instead, it is a question "to be gathered from all the facts and circumstances." *Rizzo v. Rizzo*, 3 Ill. 2d 291, 299 (1954). Specifically, courts look to "the manner in which the parties have dealt with each other; the mode in which each has, with the knowledge of the other, dealt with persons in a partnership capacity; whether the alleged partnership has advertised using the firm name; and whether the alleged partners shared the profits." *Seidmon v. Harris*, 172 Ill. App. 3d 352, 357 (4th Dist. 1988) (citing *Rizzo*, 3 Ill. 2d at 299–300).

Considering these factors, the OHA correctly determined that Blisko and Gubin Enterprises together form a partnership. Blisko and Gubin Enterprises,

together, have an ownership interest in 203 enterprises in the Midwest and Southeast. [52] ¶ 14; [42-1] at USA_1902. Sixty-one of those entities received PPP loans during the COVID-19 pandemic, totaling over $41 million. [52] ¶ 15; [42-1] at USA_1902. Among the businesses receiving PPP loans in which Blisko and Gubin Enterprises own a combined majority interest, nearly all are nursing homes structured as LLCs. [52] ¶ 17; [42-1] at USA_1902–04. That Blisko and Gubin Enterprises own so many businesses together indicates their association to carry out business for profit. As defendants put it, "such a shared empire did not form by happenstance" but rather by "conscious design." [40] at 17.

In response, Forest View primarily argues that it could not be majority owned by a common parent because Blisko and Gubin Enterprises each own 50% of the business. But again: the "common parent" is the partnership itself. Together, Blisko and Gubin Enterprises own 100% of Forest View.

Forest View also asserts that "common parent" should only apply to corporate entities based on more specific definitions of that term in other federal regulations and as used in U.S. tax courts. *See* [28-2] at 18 (citing federal acquisition regulations in 48 C.F.R. § 4.901).[4] Unlike the federal acquisition regulations, however, the Corporate Group rule does not define "common parent." *See generally* 85 Fed. Reg. 26,325. In the absence of a definition, courts "look first to [a regulation's] language, giving the words used their ordinary meaning." *Lawson v. FMR LLC*, 571 U.S. 429,

---

[4] Forest View also urges the Court to rely on the definition of "majority-owned affiliate" in 12 C.F.R. § 1234.2. [28-2] at 18. But as defendants point out, that definition appears in Federal Housing Finance Agency regulations, not in the regulations at issue here.

440 (2014). Here, the first thing to note about the term "common parent" is that it places no limit on the *type* of entity that can comprise a "parent." Without some indication that the SBA intended to limit "common parent" beyond its plain text, the Court presumes the rule to applies to common parents of *all types*, including the implied partnership between Blisko and Gubin Enterprises. If the SBA wanted to limit the rule only to certain legal entities like corporations, it could have done so expressly.

The dictionary definitions for "parent" and "parent company" support this broad interpretation. *See United States v. Patel*, 778 F.3d 607, 613 (7th Cir. 2015) (providing that courts "frequently look to dictionary definitions" to determine the plain meaning of words). For example, Merriam-Webster's defines "parent" as "a group from which another arises and to which it usually remains subsidiary," *i.e.*, "a *parent* company." *Parent*, MERRIAM-WEBSTER'S DICTIONARY (Dec. 15, 2024), https://www.merriam-webster.com/dictionary/parent. Likewise, Oxford English Dictionary defines "parent company" as "[a] company or organization which owns or controls a number of subsidiary companies or organizations." *Parent Company*, OXFORD ENGLISH DICTIONARY (last accessed Dec. 20, 2024), https://www.oed.com/dictionary/parent-company_n?tab=meaning_and_use#3195049 2100. These definitions suggest that "common parent" is defined by an entity's level of ownership or control over another entity, regardless of what legal form the controlling entity happens to take.

Finally, where a text is ambiguous, a court may also consider its purpose in determining its meaning. *See Patel*, 778 F.3d at 615. Here, a more expansive reading of "common parent" comports with the SBA's goal to "preserve the limited resources available" and "promote the availability of PPP loans *to the largest possible number of borrowers* …." 85 Fed. Reg. 26,325 (emphasis added).

To support its argument that the rule should only apply to corporations, Forest View asks the Court to rely on Black's Law Dictionary's definition of "parent corporation," which defines the term as "[a] corporation that has a controlling interest in another corporation (called a subsidiary corporation), usu. through ownership of more than one half the voting stock—Often shortened to parent—Also termed parent company." *Parent Corporation*, BLACK'S LAW DICTIONARY 418 (10th ed. 2014). But that dictionary definition is of little use here, where the relevant text is "common *parent*," not "common *parent corporation*." Indeed, the SBA's failure to expressly limit the rule to parent corporations indicates that it intended the rule to apply to all parent entities, including but not limited to parent corporations.

Relatedly, Forest View contends that because the Corporate Group Rule does not define "common parent," it could not have expected to be deemed part of a corporate group. *See* [51] at 15–16. The Court finds this scenario unlikely. As discussed, Blisko and Gubin Enterprises commonly have an ownership interest in 203 business entities that received 61 PPP loans totaling over $41 million. *See* [52] ¶¶ 14–15. They also combine to own 100% of at least two entities (Forest View and Oak Lawn Respiratory and Rehabilitation Center) and 80% of another (Parkshore

Estates Nursing and Rehabilitation Center). *See supra* at n.1; [52] ¶ 1; *Oak Lawn*, No. 23 CV 4363, at [48] ¶ 9; *Parkshore*, No. 23 CV 4367, at [46] ¶ 9. Based on these expansive shared business ventures, Blisko and Gubin cannot credibly contend that they were surprised a term like "common parent" would encompass implied partnerships such as their own.

Finally, Forest View contends that the OHA "unilaterally impose[d] a corporate structure on Plaintiffs" by deeming the relationship between Blisko and Gubin Enterprises a partnership. But as discussed, a partnership need not be written or express—it is simply an "association of 2 or more persons to carry on as co-owners a business for profit." 805 ILCS 206/202(a); *see also Rizzo*, 3 Ill. 2d at 299. The OHA did not unilaterally change Forest View's business structure merely by declaring that its two owners were engaged in an implied partnership. Forest View can be deemed a partnership for purposes of the Corporate Group Rule but still retain its legal business structure as an LLC.

The Court concludes that the OHA did not err when it determined that the Blisko-Gubin Enterprises partnership was part of a "corporate group" and therefore subject to the $20 million corporate group limit.

## III. Equitable Estoppel

Forest View next argues that the SBA should be estopped from enforcing the Corporate Group Rule against it given that 18 months before its decision denying forgiveness, it released a decision mostly forgiving Forest View's loan. Forest View insists that the Court should apply both quasi-estoppel and equitable estoppel to bar

31

the SBA from taking back its initial decision. This argument faces several major hurdles.

The first is that neither theory of estoppel appears in Forest View's complaint, *see* [1], and Forest View cannot add new claims—especially ones that it could have fairly anticipated at the time it filed it complaint—by virtue of its motion for summary judgment. *See Jordan Mozer & Assocs., Ltd. v. Gen. Cas. Co. of Wis.*, No. 14-CV-10264, 2015 WL 1911119, at *2 (N.D. Ill. Apr. 24, 2015) ("[A] plaintiff who fails to affirmatively plead waiver and estoppel claims may lose the ability to raise these arguments later."); *see also Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 489 (7th Cir. 2023) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment.").

Second, even if viable estoppel claims were at play, Forest View has made no attempt in its briefing to demonstrate that it can establish the necessary elements under either theory. *See* [28-2] at 4–6; [51] at 17–19; *Heckler v. Cmty. Health Servs. of Crawford Cnty., Inc.*, 467 U.S. 51, 61 (1984) ("[A] private party surely cannot prevail without at least demonstrating that the traditional elements of an estoppel are present."); *Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority.").

Lastly, as defendants point out, the Seventh Circuit has cast doubt on "whether equitable estoppel is available against the government" at all. *Matamoros v. Grams*, 706 F.3d 783, 793; *see also Gutierrez v. Gonzales*, 458 F.3d 688, 691 (7th Cir. 2006)

("The Supreme Court has never affirmed a finding of estoppel against the government. And that is not for lack of review.").

For the reasons discussed, the Court finds Forest View cannot proceed on its theories of equitable estoppel and quasi-estoppel.

## IV. Recoupment of Improperly Collected Funds

Finally, Forest View claims that the SBA improperly authorized the collection of its PPP loan during the period of its administrative appeal, even though the loan should have been in deferment pursuant to the CARES Act and its accompanying regulations. *See* 15 U.S.C. § 636 (a)(36)(M)(ii)(II); 13 C.F.R. § 134.1202. Federal law authorizes U.S. agencies to coordinate with the Department of Treasury to withhold government benefits to satisfy delinquent nontax debt through what is referred to as an "administrative offset." *See* 31 U.S.C. § 3716(c)(6)(A); 3701(a)(1).

In this case, the Department of Treasury began collecting on Forest View's outstanding PPP loan debt by garnishing its Medicare vouchers, even while its OHA appeal was still pending. *See* [30] at USA_1978–80. Accordingly, Forest View asks the Court to "direct the immediate reimbursement of all improperly collected funds until resolution of this Appeal and the issuance of a new Final Loan Review Decision." [28-2] at 24. Forest View pursues this argument on summary judgment and has also filed a separate motion seeking this relief, which it titles: "Motion for Interlocutory Order Compelling Reimbursement of Improperly Recouped Funds." [48].[5]

---

[5] The Court shares defendants' concerns that Forest View's request for an interlocutory order lacks a proper procedural vehicle and essentially asks the Court to issue injunctive relief before deciding the merits of the dispute. [50]. However, the Court need not address these issues given that it has now weighed in on the merits.

33

Because the Court affirms the OHA's finding that Forest View is not eligible for loan forgiveness, Forest View's request for reimbursement of any funds that should have previously been deferred is moot. Indeed, Forest View has conceded that "if the Court ultimately finds in favor of Defendants and orders the Final Loan Review Decision be upheld"—a conclusion the Court has now reached—"Plaintiff would then be required to return the reimbursed funds, as well as the remaining amounts owed on its PPP loan." [53] at 3. And Forest View has not otherwise developed an argument explaining how it might still be entitled to some kind of relief for the improper interim collection of its PPP loan in a scenario where the SBA's final decision is affirmed.

## CONCLUSION

For the foregoing reasons, the Court denies Forest View's motion for summary judgment [28], denies Forest View's motion for an interlocutory order compelling reimbursement of improperly recouped funds [48], and grants the defendants' motion for summary judgment [39] as to all counts. The SBA's final decision denying Forest View forgiveness of its PPP loan is affirmed. Civil case terminated.

Georgia N. Alexakis
United States District Judge

Date: 12/30/24

34